Good morning, the first argued case this morning is number 172587 in Divior against Dr. Reddy's Laboratories. Mr. Martin, you are splitting your argument in chief with Mr. Smerich. I am, Your Honor. Okay, the light will go on. So good morning, Your Honors, and may it please the Court. Kevin Martin for Dr. Reddy's, as Judge Newman mentioned, I'll be splitting my time. I'll be addressing the common issues, and then Mr. Smerich has some issues that are particular to his client, Watson, that he will be addressing. Your Honors, as we see it, the elephant in the room today is the Indivior 1 specification disclaimer ruling. So even though we prevailed on the question of specification disclaimer in the District Court, with Your Honor's permission, I would like to address that first before moving on to our appeal on the invalidity question. When it comes to the Indivior 1 decision, there's just a few points I'd like to emphasize. The first is that while the Indivior 1 decision addressed the continuation 305 patent, at page 20 in the panel's decision, it specifically addressed the 514 patent, which is at issue in this case, and found a specification disclaimer. The panel did that not as dicta, but because it was directly relevant and integral to the panel's claim preclusion ruling. Second, the arguments that the plaintiffs are making with respect to specification disclaimer in this case are the very same arguments that they made with respect to specification disclaimer in Indivior 1. In fact, that case was being briefed at the preliminary injunction stage while the parties were in the middle of briefing this appeal, and it was a year and a half after the trial in this case. So when the Indivior 1 case arose, plaintiffs had available to them all of the evidence that had been developed at the trial in this case, and all of the arguments which had been developed in this case. In fact, there were arguments that they made in the Indivior 1 case that they failed to in this case, because they hadn't come up with them yet. For example, their zone drawing argument. Are you basically providing a response to the cross-appeal? In a sense, Your Honor, just because it seemed like the biggest issue, but I can move on to invalidity if you'd prefer. One would think you'd raise the issue you're appealing. So I will move there, Your Honor. With respect to the question of invalidity, we think that the principal mistake the district court made was to conclude that a person of skill in the yard, despite having worked for one to three years in the coating and drying field, would not have either knowledge or access to knowledge, or even access to knowledge, of drying techniques. That mistake, which we view as a methodological mistake, almost a mistake of law, infected the district court's analysis when it came to things such as motivation to combine. In fact, if you look at the district court's reasoning, and this appears at page 178 in the appendix, what the district court said was a POSA would not be motivated to combine the prior art to achieve drug content uniformity, primarily because the POSA would have limited knowledge and access to knowledge of drying techniques. That was the reason why, for example, the district court found that a person of skill in the art would not think to combine the Schmidt prior art reference with the Strobisch prior art reference. There was no finding that the Strobisch prior art reference... Why don't you argue the references rather than the skill of the... So when you move to the references, Your Honor, and you start with the Schmidt prior art reference, there's really little dispute for purposes of this appeal that the Schmidt prior art reference gets you all the way up to the drying step. In fact, if you look at pages 57 to 58 of the cross-appellant's opening brief, and if you look at the district court's treatment of Schmidt below, they more or less acknowledge that Schmidt will get you a uniform wet matrix, and the only basis on which both the district court and the cross-appellants, the plaintiffs, distinguish Schmidt is that it doesn't get you a uniform film after the drying step. That's important. That's important. And the district court looked at the references, and that's a question of fact, what the references disclose. It is a question of fact, Your Honor, and so we're not arguing that Schmidt is anticipatory given the specifications. No, but all the references fell short according to the district court, and why don't we give some deference to those findings if they're not clearly erroneous? And clearly we respect the clearly erroneous standard, and when I stand up again to talk about the question of infringement, I'll be pounding the table on the clearly erroneous standard, but that's why I began this discussion with what we view as a methodological error by the district court, finding that a person of skill in the art would not even have access to knowledge of some of the prior art, such as the Strobish reference. So that strikes us as more of a legal error than a factual error. Now, and again, when you look at the, let's take the Schmidt reference. So if the Schmidt reference gets you all the way up to the drying step, and the Schmidt reference states on its face that there's a 10% requirement set by regulators if you want to have a film product, then a person of skill in the art, let's say a person of skill in the art starts with Schmidt, gets all the way up to the drying step, and is now banging their head against the wall at the drying step with Schmidt, that person being told by Schmidt there's a 10% uniformity requirement would go out and look for prior art, which teaches you how to get over the hump with drying. What can I do to maintain uniformity? And what we argued below was that that person of skill in the art, stumped at the drying step, would look to prior art, such as Strobish, which on its face states that it's directed toward addressing what is a uniformity defect with films. And this is where, again, we think the district court made an error. The district court at page 178 in the appendix stated that, quote, Strobish is not directed to drug content uniformity, it is directed to a surface defect called model. And model is, to be sure, a surface defect. But what kind of surface defect is it? Well, what the evidence of trial showed was that, and what Strobish on its face says, is that it's a surface defect caused by a lack of uniformity. And so you can look at page 70237 in the appendix. That's Strobish itself stating that model is a, quote, non-uniform density defect. You can look at the textbooks that were put in at trial. There's one, for example, at page 28698-99 in the appendix. This is a textbook in the coding and drying field. Well, I'm sorry, it's 70588 is where this textbook appears. That's, it describes model as a gross, non-uniform disturbance. And what our expert, Dr. Amigi, testified at trial was that to a person of skill in the art, and this is the 26, 28698 reference I gave you. Dr. Amigi testified that to a person of skill in the art, they would recognize that model is a defect caused by a lack of uniformity in the film. So a person of skill in the art who knows they have to get a uniform film to satisfy regulators, who knows they're being stumped at the drying step, would look to prior architects such as Strobish, which is designed to get you a uniform final film after the drying step and have a motivation to combine. And again, you know, if you don't believe us, you can also look at what the applicants and the And the 514 patent teaches to look at the surface of the film to tell whether it's uniform. And at page 21162 in the appendix, this is the plaintiff's post-trial brief, they argued to the district court that one of the ways you could tell that the defendant's films were uniform was that, was just by looking at the surface and seeing if there were any visual defects on the surface. So the idea that, the district court's conclusion that you could disregard Strobish because it was directed to surface defects and that's unrelated to uniformity, was contrary to all of the evidence at trial, which shows that surface defects are a symptom of a lack of uniformity. So that, we believe that's our strongest argument for why there was clear error below. We also made an invalidity argument with respect to the 150 patent, which is an issue in this case. There, the question is whether the 150 patent is entitled to a earlier priority date, the priority date of the 902 application. And what we argued was that the 902 application does not, on its face, disclose one of the key limitations of the asserted claim of the 150 patent, which is having a low molecular weight PEO be 60% or more of the polymer component. And if you look, this is a case where we just think the district court misread the 902 application on its face. If you look at page 70035 of the appendix, which is the relevant portion of the 902 application, there it talks about having low molecular weight PEO be 60% or more of the composition. When you're talking about just low molecular weight PEO and high molecular weight PEO. But then the very next paragraph goes on to discuss low molecular weight PEO being as low as 50% of the composition. Once you've added this other component, HPC. Low molecular weight, and then optionally combined with a small amount of a higher molecular weight. So wasn't that reasonably a disclosure, entitling them to the effective date? If the claims were limited only to low molecular weight and high molecular weight PEO, but then when you go on to the next paragraph, it discusses the low molecular weight PEO percentage dropping to 50% once you've added that HPC, and these claims have as a limitation HPC. So we think that the district court just misread this portion of the specification, and it does not actually support having a 60% or higher percentage of low molecular weight PEO once you've added that HPC as required by these particular asserted claims. And I see my time's about to expire, so if there are no further questions, I'll yield. Thank you, Your Honors. Thank you. We'll hear from Mr. Smith. Good morning, Your Honors. May it please the court. I will address why the district court decision to deny Watson's Rule 59 motion based on the new facts surrounding Watson's amended ANDA was an abuse of discretion that here has led to a manifestly unjust result. In the present case, Watson stands enjoined from entering the market with its non-infringing amended ANDA product. That's a product that the district court found in the second trial utilized a drawing process that had been disclaimed. The court said, I am far from sympathetic to Watson, given that they knew of Tibb's construction well before my judgment. At no time did they request a different construction. And, Your Honor, the issue in the first trial addressed Watson's original ANDA manufacturing process and the batches made using that original process. And that did not, that used a different drawing technique. The original process had a heated coating roll that separately applied heat from below the web. But was the court told that Watson was experimenting or planning to change or had changed? At the time of the initial trial, that work was not going on. It was after the initial trial in the context of the development of a commercialization process. But before the decision? It was before the decision, Your Honor, that is correct. But the amendment did not occur until after. And here, there was nothing to be done except for a new trial on the question, which has been in dispute, as to whether or not this new process was a conventional convection process that was disclaimed in the patents. Until that process was developed and until the amended ANDA was filed, that issue was not right for the court. And whether or not the court was told before the judgment or after the judgment, Rule 59 clearly provides the ability to modify after. And the result is the same. There was no strategic litigation decision here. There was simply a commercial manufacturing process. Well, if it wasn't right, what are you complaining about? Well, at the time the Rule 59 motion was filed after judgment, at that point in time, the decision had been made to move forward with the commercial process. And in the context of an ANDA, where the court is instructed to look at the product that's likely to be brought to market, we believe at that point it was ripe and in front of the court. And here, in fact, the judge believed that as well, because the judge held the Rule 59 motion for over a year. This is a very unique set of circumstances, not likely to reoccur. The district court below took the motion under advisement, held a second trial, took additional evidence, and made additional findings of fact and conclusions of law. Finding that process was a non-infringing process. So the first trial did not involve the process. The public interest in achieving finality and judicial efficiency. Complimented you by calling you sophisticated, sophisticated repeat litigants. Your Honor. You should be bound by the litigation decisions you made. And Your Honor, what I would say here again is it's a different process. But more importantly, that clearly doesn't make sense in the context specifically presented here. The court found that the strong public policy in bringing a generic to market was offset by finality and judicial economy. But that's just not the case here. The judgment didn't become final for over a year. The district court specifically held it after its initial decision to take new evidence about the amended process. In addition, nothing in the judgment would prevent Watson from going back and filing a new ANDA with a new product that utilized a non-infringing drying technique, which would provoke yet a new set of litigation about a process that has already been found in the second trial to be non-infringing. And indeed, the Federal Circuit has recognized that ANDA applicants, like anyone accused of patent infringement, can design around. And those are the fairing cases that we cited in our brief. So here, the fact that- Of course, it's an ANDA. You have to basically copy and delete the approved product. There's only so much design around you can do. But here is a situation, as was in fairing, where there is a design around where the drying limitation and the specification disclaimer give rise to the ability to bring a non-infringing generic product to market. And it would simply be a manifest injustice where the issue was not tried. It's clear it was not tried in the original trial. It was raised to the district court after it had been determined valid for a commercialization process. It clearly was not waived. And in fact, in the new trial, the judge found that that process would not infringe the drying limitation, which the court found was the same as between the 514 and the 497. And the last thing I would say is this situation will not reoccur. It's been clarified in the regulations, as noted in our brief. Within a week after the amendment was filed, the FDA issued new regulations which make clear that any amendment, such as this one, would require a recertification. So Watson, in that scenario, had that regulation been in effect, which it is now, Watson would have had to recertify to infringement of the 514 patent. That would have provoked a new case. And that new case would have been consolidated into the existing proceedings. The end result would have been a consolidated trial exactly the same as the issues presented in the actual second case. So we think here, in order to avoid the manifest injustice of blocking a non-infringing generic product from the market and treating different litigants differently, the decision should be reversed and entry of non-infringing. Even though that ANDA wasn't filed on the new process? The amended ANDA was submitted in September prior to the second trial. And actually, the second trial specifically addressed the amended ANDA process. And it was the amended ANDA process. But the ANDA has to have been approved before this entire system can take effect, doesn't it? I'm sorry, Your Honor. But the ANDA filing, applying, isn't what triggers this entire Hatch-Waxman procedure. It's the approval of the ANDA. It's actually the certification. When the ANDA is filed, or now, when an amended ANDA is filed, we would have to provide a certification of invalidity or non-infringement and give notice to Indivior. Yes. And that would provoke the lawsuit. Okay. Let's hear from the other side. Thank you, Your Honor. Mr. Ellington, you're going to respond to both of these issues? I am. But additionally, we have our own appeal and cross-appeal points on infringement issues. Okay. So I'll proceed as the Court wishes. I was hoping to spend most of my time on our own issues that are on appeal. Well, the cross-appeal is pretty much decided, right? In the earlier case. I don't believe so. The O'Connor patent. Your Honor, the earlier decision didn't address most of the infringement issues. For example, that of zone drawing. That wasn't presented because the central issue was, were the claims essentially the same in the 305 patent as in the 514 patent? Additionally, under the law, and this comes from the Supreme Court and the Kamenish case and a variety of decisions of this Court, outside the box, Gillette and others, that was a tentative ruling. It was on a preliminary injunction, a limited record. And there's no reason why this Court cannot look at the issue afresh. Indeed, we're entitled to that because the fact that we had already lost the Delaware Court was a consideration. It's addressed in the decision vacating the PI appeal. I even received a question about, doesn't the fact that we lost in Delaware undermine our position here today? We're entitled to our day in court. This is the day in which this Court should hear the appeal of the Delaware judgment. The issue hasn't been decided. The majority... On the 305 patent, the interpretation that the disclaimer was not couched in any tentative manner, as if to say, for purposes of the preliminary injunction only. There was a pretty forthright statement that the panel made. The specification makes clear that a film produced using only conventional top air drawing cannot satisfy the claim limitation. We conclude that the 305 claims exclude conventional top air drawing. Those are pretty forthright statements, unqualified by the nature of the proceeding. Absolutely, but they're qualified by the posture of the case. This was an appeal from a preliminary injunction ruling. There hadn't even been a claim construction hearing or briefing in the proceeding below in New Jersey. We do have that in Delaware. So the Court, with time constraints, with limited briefing focused on the issues of preclusion, we believe reached the wrong decision and is free to look at it again. In Gillette, this Court said that the District Court is not bound by what the Federal Circuit did in reviewing an earlier application for a preliminary injunction. So we believe the decision's wrong. I want to set that aside for a moment, focus on zone drawing. We haven't waived that issue. In fact, the preliminary injunction appeal decision distinguishes, as the patent does, between, on the one hand, conventional drawing techniques using drying ovens, tunnels, and the like. You'll find references to that in column three of the 514 patent. And control drying methods. One of those control drying methods is bottom drying. And that's very clear from the discussion in column four. I'm happy to walk through this chapter in verse. But if we then move ahead to column 28 of the patent, this is where there's an embodiment that's discussed, figure six, which the panel quoted in its decision vacating the preliminary injunction. It's a discussion of a single embodiment, figure six. This Court recognized that in its decision. And the law is clear. What's said about one embodiment, it doesn't apply to every other embodiment in the patent. And when we look forward and we see other embodiments discussed, figure six and seven are restricted to bottom drying. Figure eight, the drawing shows bottom drying, but it's not required. Then we have a reference to the Magoon teaching. And then we come to columns 32 and 33. And that's the description of zone drying. No mention of top air or bottom air. And that's what DRL uses. They're using the exact zone drying described in the patent. A stepped up drying effect with the temperature increased from zone to zone. It follows that teaching of the patent. That's not subject, can't be subject to any disclaimer. There's no way that column 28 in its description of the embodiment of figure six or column three with its discussion of conventional drying technology can disclaim other embodiments. The question is, read as a whole, is there a disclaimer of anything? There certainly can't be a solely conventional convection air drying from the top. That's a statement about one embodiment. Figure six in column 28. So we think that the panel got it wrong before. But additionally, it didn't address the issue of zone drying. Zone drying is something that's a separate controlled drying element. It's one controlled drying method. It's the method that the DRL follows exactly as it's taught in the patent. The patent even says that this is a method that will avoid skinning, which the patent elsewhere uses interchangeably with wetting. So the decision in the context of the preliminary injunction, not only is it not binding, it's wrong, and it doesn't address fundamental issues of infringement. It couldn't have the issues. Then at hand, we had to accept what the Delaware court did and then argue whether the claims were essentially the same. So for all those reasons, we don't see how the preliminary injunction appeal could possibly bind litigants in this proceeding on a different patent and bound by a decision that's labeled non-precedential. So it's non-binding, non-precedential, and we encourage the court to look closely at that. I think read closely, it doesn't look like any disclaimer case. The non-precedential aspect of it doesn't affect what this panel should do with respect to that clamp construction issue. There's no rule of law that's stated there that isn't binding by virtue of it being non-precedential. That's not your best argument. I'm sorry? That's not your best argument. Okay. Well, then our best argument is it's tentative based on a limited record. The court didn't have the district court's ever-changing claim constructions before it then. So we have claim constructions that morph from case to case. Now, and we've detailed this in the brief, the first go-round, there is no disclaimer that attaches, presumably because sophisticated repeat litigants, I think that was the phrase, they didn't see this clear and unmistakable disclaimer. Then in the next case, there is a disclaimer, and it's found to be solely conventional convection, air drying from the top. And the district court inserted the word solely because there were embodiments using top air. And then it came to rippling. Rippling is the touchstone for whether or not something is disclaimed. That's in the Alvagen opinion, which was applied, purportedly applied, in the trial decision here. And then in the trial decision, we have yet what is, in effect, a new claim construction, where the focus is on is the process used as a whole conventional? This is where the original disclaimer was in terms of is the top drying used, used by itself to dry, and is it conventional? And now it's about the process as a whole, including the bottom drying, which the district court said was done in such a way that the drying from the bottom approached that of the top. I want to ask you about the 150 patent and its entitlement to the filing date of the earlier application. Your opponent said the earlier application adequately discloses high molecular weight and low molecular weight, PEO. I'm sorry, Your Honor, I missed the last. PEO, high molecular weight and low molecular weight. So there are factual findings made based on testimony received. This is an issue of fact, the entitlement to the priority date. And the 902 application is very clear. It gives direction about how much of the low molecular weight PEO to be used. It's up to 60% of the PEO blend. It says the PEO blend polymer component, but the court understood that based on the testimony to be the entirety of the polymer component. Right below that, you have a reference to HCP being part of this embodiment. And all of this is in a description in the 902 application of a particular embodiment with special properties. So we think it's clearly here. And it says right below that, to balance these properties, this is the appendix at 70035, desirable film compositions may include about 50 to 75% low molecular weight PEO. And then it's optionally combined with the HCP. Earlier in the 902 application. Another point to your cross-appeal regarding the 832 patent. I'm sorry? The 832 patent. So that doesn't seem to be contested. They have a joint issue on it. The 832 patent, the claims were invalidated on the specific ground of obviousness. The court, the Delaware court, rejected the decision that, rejected the contention that it was anticipated by Lab Tech. And in the intervening period, the PTAB invalidated the same claims, claims 15 through 19, because they were anticipated by Lab Tech. Under Fresenius, the proper procedure should be that those, the decision of the district court on those issues should be vacated. We don't have an ability to appeal anymore because those claims don't exist. They've been canceled as a result of the PTAB proceeding. I see that I'm in my, I'm over my time. Yes, we'll save your rebuttal. Let's proceed with the other side.  The three minutes. Thank you, your honor. Okay, so your honors, turning to the cross appeal, we think it's fairly clear if you look at the decision in Indivier 1, that the question of specification disclaimer was clearly joined. That was not just a case about claim preclusion. And in fact, when you look at the slip opinion, the majority slip opinion from pages 8 to 19, that is all about specification disclaimer. What about the zone drawing? So the zone drawing, your honor, was extensively briefed in the Indivier 1 case. I was kind of surprised to hear that zone drawing wasn't before the court. If you look at plaintiff's brief in that case, from pages 9 to 10, 45 to 46, and 49 to 50, you will see them arguing about zone drawing. Now, was zone drawing preserved in this case? It wasn't. We made the point in our response to their cross appeal that it wasn't preserved. And what did they come back with in their reply brief? They said it was preserved in two ways. First, they said they argued zone drying in their post-trial brief. You can't preserve what is effectively a claim construction argument in your post-trial brief. If they had made this argument earlier in the case, obviously questions like validity and infringement would have been developed very differently by the experts in a trial. And in any event, how does the discussion in the patent relating to zone drying relate to the construction of drying that we made in the earlier case? Well, so the discussion, the specification of zone drying says nothing about where the air is coming from. It certainly does not say that the air is coming from the top in a conventional manner. What it does say is that when you're using a zone dryer, drying must be performed in accordance with the invention, and in a controlled manner in accordance with the invention. And the invention only discusses three types of drying. Controlled bottom drying, microwave drying, or some mix of top and bottom drying, where the bottom drying is doing most of the work. And now this brings us to the district court's factual finding that as construed, Dr. Reddy's does not infringe the patent. Because what the district court found was that plaintiffs in many ways dropped the ball in trial and during their development of the evidence because they did not take measurements within the oven to see what amount of heat was above the matrix or below the matrix. They didn't measure the airflow. So the plaintiff simply did not meet any kind of burden of production or proof to show that the majority of the drying was occurring below the film. What the district court did find, and this is a factual finding, which we do not see a challenge to on this in their briefing. This is at page 150 in the appendix. The district court found that looking at the way we operate our dryer, it's conventional. In a quote, in a conventional coating and drying equipment, a person of skill in the art could control the temperature, the line speed, the air velocity, the direction of the air nozzles in order to produce a desired product. Plaintiffs do not argue that the district court's factual finding that a conventional oven would have all of these controls and that a person of skill in the art as of 2001 could use those controls in the way we do to come up with a uniform product was wrong. And they couldn't argue that because there was plenty of evidence at trial, including from their own expert. I would suggest, for example, pages 27, 887 to 88 in the appendix. Their expert testified that these were conventional controls. Our experts certainly testified that these were conventional controls. And so based on that finding, the district court found that we're not doing anything that wasn't known in the art as of 2001 when it comes to drying films. You know, there's the issue. One of the arguments that they often make is that, well, we have a uniform film at the end of the day, so we must be doing something unconventionally. The district court's claim construction was very clear that while our method of drying may be associated with the rippling effect and with a lack of uniformity, there are ways, for example, using these various controls for somebody through an iterative experimentation with various parameters to obtain the desired level of uniformity. That's what we did. It was nothing novel. It was nothing that they can obtain a monopoly to. OK. Thank you. Thank you. Save one minute. You'll have to talk fast. Thank you, Your Honors. A statement that was made was that in the initial trial, there was no specification disclaimer, no claim construction proffered with respect to the drying limitation. And I think what's clear here is, again, Watson's original and described a drying process that utilized a heated coating rule. And that's not in dispute. And Watson's experts have consistently said that that heated coating rule was there to specifically apply heat from below the web in order to set the film at the time that it was cast. That was in the original trial, Dr. McConville. And that's in the trial opinion in the record at 1-111. And as well, Mr. Gogelin, who testified in the second trial, he was asked at his deposition about that process. And he specifically conceded that it was used to set or freeze the film. And when asked how that was accomplished, he said by applying heat from below the web. So at no point in time did Watson use a solely top air drying in connection with the original ANDA. So there was no reason to proffer a claim construction at that time. And for that reason, there is no preclusive effect. And Watson's amended ANDA, which does not make use of a heated coating rule, was found not to infringe the drying limitation of the 497 patent as properly construed, which the court found was the same as the 514. And again, we think it would be a manifest injustice to block a generic from the market where the court actually took the time to have a second trial that, in the rare circumstances presented here, was already on calendar at the time the Rule 59 motion was presented and yet still block the product from the market. Thank you. Thank you. Mr. Ellicott, you have the last word on the cross-appeal. Thank you. I believe that when you check the briefs below, you'll see that the discussion of zone drying was in the context of, I believe, the written description issue. In any event, that's a different appeal. We're here on the 514 patent, and the law is clear that we're entitled to our day in court. And I think, as well, the decision of breach by the panel in the preliminary injunction is wrong. Let me give a couple of examples. Column 4, lines 61 through 62, states that there is an alternative to any controlled drying method, and that's selecting polymers that will themselves provide a viscosity so that drying, it's an alternative to controlled drying entirely. We haven't heard anything about that in the briefing or anywhere else. That's part of this patent. It can't be the case that the drying methods are then restricted in some way. I want to also point to column 23, and this is at the appendix at 344. And what you'll see at 21 through 24 is a reference to interaction of the different steps.  What drying methods will work and what won't work will depend upon other steps in the process. That's what the patent's explaining here. It explains it elsewhere, too, detailing the best ways to mix, to cast, and the like. There is no statement here that could possibly amount under this Court's precedent to clear an unmistakable disclaimer. We were told that the issue of zone drying was waived. We've provided three sites, I believe, three arguments as to why there can't be any waiver here. First, we were arguing for the plain meaning initially. That was our position. So we can't be waiving arguments about what is or isn't included in the disclaimer that the Court eventually reached. The second is in the Alvagen proceedings, and the Delaware District Court took those claim construction results and applied them in the DRL case. We argued about zone drying there. Whatever conventional convection air drying from the top means, it doesn't mean zone drying. We just heard Mr. Martin say the zone drying example does not restrict where the air comes from, and that's clear not only from the description, but from the figures to which it refers, figures 35 and 36. So whatever could possibly have been disclaimed in this ever-changing scope of disclaimer, it doesn't include zone drying, which this Court, in its decision vacating the preliminary injunction, would have described as a controlled drying method. It distinguished between controlled drying methods and conventional drying techniques solely from the top, the latter of which it said was disclaimed. It distinguished those from controlled drying methods. Column 32 identifies zone drying as another method of controlled drying, a little later in the column, it specifically says that it's of the present invention. So the judgment of non-infringement here should be reversed. This was the only element purportedly not met. We don't believe there's any basis for a disclaimer, but if there is, zone drying can't possibly fit within. Do Your Honor have further questions about any of this? I think that's for this case. I think we've raised all the issues now.